729 S.E.2d 210

**T.H., Respondent Below, Petitioner**

v.

**D.K. & R.R., Petitioners
Below, Respondent.**

No. 11–0110.

Supreme Court of Appeals of
West Virginia.

Submitted May 22, 2012.

Decided June 12, 2012.

T.H., Parsons, WV, pro se.

Shannon R. Thomas, Esq., Weston, WV, for Respondents.

PER CURIAM:

The petitioner, T.H.,[1] appeals the September 21, 2010, order of the Circuit Court of Tucker County reversing the June 25, 2010, order of the Family Court of Tucker County denying respondents D.K. and R.R.'s motions for modification. The circuit court's September 21, 2010, order granted the respondents' motions for modification and awarded primary custody of minor children M.R., S.R. and E.H. to the respondents. The petitioner argues that the circuit court erred in ruling that the family court was incorrect in failing to find a substantial change in circumstances pursuant to W. Va.Code § 48–9–401(a) (2001).

After a thorough review of the record presented for consideration, the briefs, the legal authorities cited, and the arguments of the petitioner and the respondents, we find that the family court erred in concluding that a substantial change in circumstances was not present under the facts of the case, and we find that the circuit court did not commit error by reversing the family court's June 25, 2010, order. We therefore affirm the circuit court's September 21, 2010, order.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, T.H., is the mother of six children, three of whom are minors and the subject of this custody dispute. The three minor children are M.R., age 16; S.R., age 13; and E.H., age 6. The respondents, D.K. and R.R., are T.H.'s ex-husbands and fathers to the three minor children. Respondent D.K. is the father of E.H., and respondent R.R. is the father of M.R. and S.R.

Upon her divorces from D.K. and R.R. on October 30, 2006, and October 29, 2004, respectively, T.H. received primary custody of the minor children. T.H. maintained primary custody of all three minor children until the events which gave rise to this proceeding. The three incidents in question

---

1. Consistent with this Court's practice of protecting the identity of juveniles in sensitive matters, we identify the parties, children, and family members involved in this case by their initials only.

took place between May 2008 and September 2009.

The first incident occurred on May 8, 2008, and involved only M.R., who was to attend the West Virginia State Social Studies Fair in Charleston, West Virginia, at 8:00 a.m. that morning. The night before, respondent R.R. offered to drive M.R. to Charleston, but T.H. insisted on driving M.R. on the morning of the event. To arrive at the fair on time, T.H. would have needed to leave home with M.R. by approximately 5:30 a.m.

On the night of May 7, T.H. was experiencing difficulty sleeping. She took one Ambien pill[2] at approximately 10:00 p.m. Still unable to fall asleep, she took another half Ambien pill. She testified before the family court that she knew the extra half Ambien pill was outside of her prescribed amount.

On the morning of May 8, R.R. testified that he spoke with both M.R. and T.H. on the phone and that T.H. asked for directions to Charleston. R.R. stated that T.H.'s speech was slurred. R.R. then spoke with M.R. again and instructed her to get out of T.H.'s vehicle, telling her that he would send someone to pick her up. He called his mother, then called the police.

Sgt. R.L. Stump of the West Virginia State Police stopped the vehicle with M.R. and T.H. in Tucker County. When he stopped the vehicle, M.R. was driving, and T.H. was in the passenger seat. M.R. was twelve years old at the time. Sgt. Stump testified that T.H. appeared coherent and alert and only cited her for "permitting no operator's" for allowing M.R. to drive. M.R. and T.H. were then picked up by different people. Sgt. Stump stated that the vehicle was released to relatives from the scene because of the concern that T.H. might be unable to drive for falling asleep and also because of damage to the vehicle.[3] Sgt. Stump did not contact Child Protective Services regarding

this incident. T.H. testified that she did not recollect very clearly the events of that day.

In response to the May 8, 2009, incident, R.R. filed a petition for modification in the family court on May 20, 2009. Ten days later, on May 30, 2009, he filed a motion for ex parte relief requesting custody of M.R and S.R. The family court awarded R.R. temporary custody of the two children. Regarding the petition for modification, the parties reached an agreement that was adopted by the family court. This agreement allowed T.H. to retain primary custody of M.R. and S.R., but to do so, T.H. was required to complete drug addiction counseling, allow R.R. access to her medical records, advise R.R. of prescribed drugs, and submit to random drug screens. After entry of the order, T.H. resumed primary custody of M.R. and S.R.

The second incident occurred in September 2009. At that time, T.H. had been taking prescription antidepressant medications for a number of years. In December of 2008, T.H. stopped taking her antidepressants without the advice of her treating physician because she felt "a good bit better." She testified that she again became depressed in April of 2009 following a death in her family and that she sought treatment for her depression again in September of 2009.

On September 14, 2009, T.H. began seeing psychiatrist, Dr. Salman.[4] Prior to this date, she had been treated by a general physician, Dr. Gainer. According to Dr. Salman's testimony, he diagnosed T.H. as having a panic disorder with agoraphobia. He testified that he was aware that T.H. had left her job because of her anxiety issues. He stated that her symptoms leaned toward bipolar depression, but that he needed to "gather[ ] all the data" to make that diagnosis.

During her initial visit with Dr. Salman, T.H. was prescribed Depakote.[5] The dosage

2. Ambien is a prescription sleep medication.

3. Sgt. Stump identified damage to the front, right side of the vehicle. Although he described the damage as appearing "fresh," it is unclear from the record whether the damage existed before May 8.

4. Dr. Salman is misnamed "Dr. Salmon" in the transcripts from the family court hearings.

5. Depakote is a strong mood stabilizing medication. Dr. Salman also prescribed a lower dose of Paxil, an antidepressant and anti-anxiety medication, and he prescribed Ativan, an anxiety medication, to be used on an as-needed basis.

was to increase gradually over the week until T.H. would be taking three pills per day. Within the first few days of taking Depakote, T.H. experienced side effects that caused her to experience dizziness, drowsiness, slurred speech, and falling. She visited Dr. Salman again on September 18, 2009, and reported these symptoms to him. In response, he instructed her to stop taking the Depakote, and he prescribed Lamictal.[6]

On September 19, 2009, T.H. testified that she was experiencing extreme depression and that she wanted to be alone that evening. She placed pillows in a bed to make it appear as though she was sleeping, then she went to the camper outside of the residence and took three Depakote pills despite knowing of the side effects and Dr. Salman's instruction to stop taking the medication. According to testimony, the minor children were asleep in the house and were supervised by T.H.'s husband, W.M.[7]

On the morning of September 20, 2009, W.M. found T.H. asleep in the camper. He was able to wake her, but she was lethargic. Two of T.H.'s adult children arrived at the home, and because they were both concerned about T.H., one of the children called 911. W.M. testified that T.H. had previously discussed suicide with him, and that if she ever tried to kill herself, she would do it in the camper. T.H. was taken to the hospital, and because of the concern of her family, she was placed on a suicide watch. Toxicology reports showed that the drugs in T.H.'s system did not exceed therapeutic levels; however, on September 22, T.H. was admitted to Chestnut Ridge Hospital because of the concern that she might be suicidal. When T.H. tried to leave Chestnut Ridge Hospital, W.M and one of T.H.'s adult daughters had T.H. involuntarily committed to the hospital. She was discharged from the hospital on September 28. T.H. maintains that she never attempted suicide.

As a result of the prescription drug use and hospitalization of T.H., both R.R. and D.K. filed motions for modification and ex parte motions for custody of their respective children. The family court granted temporary custody of the children to their fathers on September 28, 2009.

The third incident occurred subsequent to the execution of the orders granting D.K. and R.R. temporary custody of their children. D.K., who was residing in California in September of 2009, traveled to West Virginia to enforce the September 28, 2009, ex parte order on September 30. T.H. became aware that D.K. was in West Virginia, and on that evening retrieved E.H. from her adult daughter's care and began traveling to a friend's home in Fairmont to prevent D.K. from taking custody of E.H. T.H. testified that at that time she did not know that D.K. had a court order granting him custody of T.H.

During the trip to Fairmont, T.H.'s adult daughter, M.K., called T.H. to tell her about the court order. According to T.H., she was in Oakland when she received this call. She testified that she was upset and stopped the car then spoke to M.K. and others. T.H., M.K. and T.H.'s sister, C.N., testified that T.H. made comments about driving off the side of a hill. T.H. later testified that she never had any intention of hurting herself or E.H. There was also testimony that T.H. made comments to E.H. during the trip referring to D.K. as "the devil" and saying that D.K. wanted to steal E.H. At that time, D.K. and the police were searching for T.H. and E.H.[8]

T.H. refused to return to her home with E.H. Instead, she agreed to allow M.K. to meet with her to pick up E.H., but M.K. testified that T.H. told her that she would "run" if the police became involved. M.K. met with T.H. and picked up E.H. between 11:00 p.m. and 12:00 a.m. M.K. then drove E.H. to D.K.

---

6. Lamictal is also a strong mood stabilizing medication.

7. T.H. and W.M. have since divorced.

8. Upon arriving in West Virginia, D.K., accompanied by police officers, went to T.H.'s home to take custody of E.H. D.K. and the police waited for hours for T.H. and E.H. to return, eventually contacting T.H.'s daughter, M.K., to discover that T.H. had E.H. had gone elsewhere.

After delivering E.H. to M.K., T.H. testified that she continued to drive for a while before going home. Because T.H.'s sisters were concerned about her well-being, they searched for her that night with the help of police officers.[9] The sisters and police found T.H. on the morning of October 1, 2009, asleep at home. Later that morning, T.H. met with a friend, A.P. A.P testified that she helped T.H. flush excess medication that T.H. had failed to take as prescribed to avoid her failure to take the medication from becoming an issue in future court actions involving T.H.'s children.

The family court ultimately combined D.K.'s and R.R.'s September 2009 motions for modification for reasons of judicial economy. Hearings on the motions were held on April 20, 2010; May 7, 2010; and May 18, 2010. On June 25, 2010, the family court entered an order denying the motions for modification, allowing T.H. to retain primary custody of the three minor children. In the order, the family court said as to the May 8, 2008, incident, "[T]he Court FINDS that [E.H.] was not at risk of harm during this incident." In regard to the September 2009 prescription drug use and hospitalization, the family court stated, "The Court FINDS that the children were never in any danger during the incident as [W.M.] was present at home with the children at the time." Finally, as to the September 30, 2009, custody incident, the family court said,

> In rendering its decision, the Court is not considering the actions of [T.H.] on the day she learned of [D.K.]'s Ex Parte Order as the behavior of [T.H.] on this date was caused by [T.H.]'s knowledge of the Ex Parte Order and there is no evidence that [T.H.]'s behavior on this date should be considered as part of her 'normal' behavior.

The family court continued, "The Court FINDS that there was insufficient evidence or expert testimony provided by [D.K.] to prove that the child, [E.H.], has been alienated by [T.H.] toward [D.K.]"

D.K. and R.R. appealed the family court order to the circuit court which reversed the family court on September 21, 2010, and placed the three children in the primary custody of their fathers. In doing so, it concluded that the family court had abused its discretion. The circuit court remanded the case to the family court to enter an order modifying the custody arrangement. T.H. now appeals the circuit court's order to this Court.

## II.

### STANDARD OF REVIEW

■ On appeal, T.H. argues that the circuit court erred in reversing the family court's order.

> "In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law de novo." Syllabus, Carr v. Hancock, 216 W.Va. 474, 607 S.E.2d 803 (2004).

Syl. pt. 1, *In re Visitation and Custody of Senturi N.S.V.,* 221 W.Va. 159, 652 S.E.2d 490 (2007).

## III.

### DISCUSSION

■ The petitioner, T.H., assigns as error the ruling of the circuit court that the family court was incorrect in failing to find a substantial change in circumstances pursuant to W. Va.Code § 48–9–401(a) (2001). The statute states, in pertinent part,

> [A] court shall modify a parenting plan order if it finds, on the basis of facts that were not known or have arisen since the entry of the prior order and were not anticipated therein, that a substantial change has occurred in the circumstances of the child or of one or both parents and a modification is necessary to serve the best interests of the child.

W. Va.Code § 48–9–401(a). This Court has further held that "[t]o justify a change of child custody, in addition to a change in

---

9. T.H.'s sisters filed a missing persons report with the police.

circumstances of the parties, it must be shown that such change would materially promote the welfare of the child." Syl. pt. 2, *Cloud v. Cloud*, 161 W.Va. 45, 239 S.E.2d 669 (1977).

Although the family court's order did use the language "a substantial change in circumstances" at one point in its June 25, 2010, order,[10] the order did not cite or mention W. Va.Code § 48-9-401(a). Instead, the family court order relied heavily on the testimony of T.H.'s psychiatrist, Dr. Salman, who did not believe that T.H. posed a danger to her children, in reaching its decision not to remove the children from the primary custody of T.H.

This Court agrees with the findings of the circuit court that the family court order erred in refusing to consider relevant and pertinent facts. Furthermore, this Court agrees with the circuit court's conclusion that the family court's ultimate disposition was flawed. Regarding the May 8, 2008, incident with M.R., the family court's conclusion that E.H. was not in danger was superficial. The circuit court stated,

The Family Court found ... that [E.H.] was not in any danger during the May 2008 driving incident involving [M.R.], but the Family Court provides no further analysis in regards to this statement. This Court is left to assume that because the Family Court found that [E.H.] was in no danger that the Family Court determined the May 2008 incident was not a substantial change in circumstances. If this is the Family Court's position, this Court FINDS that the Family Court erred.

Admittedly, [E.H.] was in no danger because she was not in the vehicle on this particular date, but such a finding without analysis does not take into consideration the entirety of the circumstances. This was the first incident of [T.H.]'s bad judgment.... This Court cannot understand how a misuse of prescription medication that resulted in a twelve year-old driving on a public road while her mother was in the passenger seat does not merit more

reaction, no matter whether [E.H.] was in the vehicle.

(Emphasis removed). Although [E.H.] was not in the vehicle during the May 8, 2008, incident, the establishment of [T.H.]'s poor judgment which unquestionably placed [M.R.] in danger, especially when viewed in light of the later incidents in question, constitutes a substantial change in circumstances.

■ The family court's analysis of the September 2009, incident involving T.H.'s prescription drug use and subsequent hospitalization was equally superficial. The circuit court said,

[T.H.] deliberately took medication that she was no longer prescribed at the highest level recommended for her step-up program. She was well aware of the side effects of this medication and chose to take it anyway, endangering her own safety.

The evidence is contradictory as to whether [T.H.] was attempting to commit suicide, but the facts are clear that her actions were dangerous to her, and as such affected her children.... The [family court's] Order did not examine or analyze the entirety of the situation or even apply the facts to the law to determine whether the September 20, 2009, incident resulted in a substantial change in circumstances. Because of the Family Court's scant factual findings and lack of analysis, this Court FINDS that the Family Court was clearly erroneous in not examining the entirety of the facts surrounding the September 20, 2009, overdose and abused its discretion by not applying the law to these facts with which to make a finding whether [T.H.]'s actions were a substantial change in circumstances.

(Emphasis removed). For the reasons stated by the circuit court, this Court also finds that the family court failed to thoroughly examine the facts. As a result, the family court conducted an incomplete analysis and incorrectly found that a substantial change in circumstances had not taken place.

---

**10.** The family court's order states, "There have been essentially three incidents alleged by the Petitioner that he contends are a substantial change in circumstances which he argues should result in a change of custody."

■ As to the third incident on September 30, 2010, this Court also finds error in the family court's analysis. The family court chose not to consider this incident because it was not part of [T.H.]'s "normal" behavior. The circuit court responded,

[T.H.]'s actions were reflective of a lack of good judgement stretching back to December 2008. [T.H.] admitted in her testimony that she was taking [E.H.] to Fairmont so that [D.K.] could not see [E.H.] Furthermore, [T.H.] did not take her medications on that day. Also, according to [A.P.], [T.H.] deliberately disposed of the medications she did not take that day in an attempt to deceive anyone should they assert a custody action against her. Such actions were, in fact, part of a consistent pattern of behavior on the part of [T.H.] from December 2008 to October 1, 2009. Thus, the Family Court should have considered the actions of [T.H.] on September 30, 2010, and was clearly erroneous for not considering them and abused its discretion by not applying the law to these facts.

The Court agrees with and adopts the circuit court's reasoning and conclusion. Furthermore, although this Court does not agree with the family court's conclusion that T.H.'s behavior on this occasion was not "normal," especially in light of her past behavior, it is not clear to this Court why the family court found that normal behavior was irrelevant to this proceeding. All behavior that may be properly considered, be it normal or abnormal, is relevant.

The family court appears to have relied heavily on the statements of Dr. Salman. It found,

Dr. Salman testified that [T.H.]'s bipolar diagnosis is completely under control with her current medications. Dr. Salman testified that it was perfectly safe for [T.H.] to have custody of her children and he, in fact, testified that he would trust [T.H.] with his children.... As Dr. Salman testified that [T.H.] is capable of caring for her children and is no danger to her children and [T.H.]'s employer has found her capable of caring for other people's children, the Court is not going to take custody of [T.H.]'s children from her.

The circuit court, in reversing the family court, found,

Because the Family Court provides no definitive ruling, this Court cannot determine if the Family Court's analysis of Dr. Salman's testimony is in regards to a substantial change determination or in regards to the best interests of the children.

. . .

[Dr. Salman's] testimony does not refute [T.H.]'s lack of judgment as displayed from December 2008 through September 2009. Dr. Salman also relied on [T.H.]'s own self reporting in making his determination. Dr. Salman admitted that he was unaware of the May 2008 incident involving [M.R.] and the September 30, 2009 incident involving [E.H.] Dr. Salman also testified that he was unaware of any problem [T.H.] may have had with Ambien and that he had not reviewed Dr. Gainer's [T.H.'s primary physician] records. The Family Court relied heavily on Dr. Salman's testimony, but it appears Dr. Salman has only received information from [T.H.] and her family and that he was unaware of the entirety of [T.H.]'s actions.

This Court agrees with the circuit court's conclusion that the family court's order did not provide a definitive ruling, and furthermore, that it placed improper emphasis on the uninformed testimony of Dr. Salman.

Finally, this Court notes that each of the three instances giving rise to this appeal cannot only be examined in individual vacuums; they must be evaluated within the entire context of [T.H.]'s relationship with her children. While this Court believes that T.H. cares deeply for her children, as of the time the family court entered its order in September 2010, the facts developed below demonstrate a pattern of poor decision-making on the part of [T.H.] in taking prescription medications. This pattern posed a palpable risk to her children's emotional and physical safety. Therefore, this Court concludes that the circuit court's order, which found that a substantial change in circumstances had occurred and that the best interests of the minor children are to be with their respective fathers, should be affirmed.

## IV.

### CONCLUSION

For the reasons set forth above, this Court affirms the circuit court's order entered September 21, 2010, which reverses the family court's June 25, 2010, order.

Affirmed.

Chief Justice KETCHUM dissents and reserves the right to file a dissenting opinion.

KETCHUM, C.J., dissenting:

W.Va.Code § 51–2A–14 (b) and (c) [2005] says that a circuit judge "may only consider the record" created in the family court, and may only reverse the family court judge if she was clearly wrong. The circuit judge can't substitute his own interpretation of the evidence simply because he would have done things differently.

I agree with the family court judge who observed the parties and witnesses during three days of bench trial. The circuit court, and now this Court, is substituting it own interpretation of the record. The mother should have kept primary custody of the minor children. I, therefore, dissent.